Filed 9/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| IREAN AMARO, | |
|    Plaintiff and Respondent, | G058371 |
|      v. | (Super. Ct. No. 30-2017-00917542) |
| ANAHEIM ARENA MANAGEMENT, LLC, | O P I N I O N |
|    Defendant and Respondent; | |
| RHIANNON ALLER, | |
|    Intervener and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Glenda Sanders, Judge.  Reversed and remanded as directed.

Donahoo & Associates, Richard E. Donahoo; Gleason & Favarote, Torey J. Favarote; Law Offices of Joseph R. Becerra, Joseph R. Becerra; and Esner, Chang & Boyer, Stuart B. Esner, Holly N. Boyer for Intervener and Appellant Rhiannon Aller.

Sheppard, Mullin, Richter & Hampton, Jason A. Weiss, Matthew M. Sonne, Frances M.K. Hernandez and Tyler Z. Bernstein for Defendant and Respondent Anaheim Arena Management, LLC.

Capstone Law, Ryan H. Wu, Liana Carter and Eduardo Santos for Plaintiff and Respondent Irean Amaro.

\*       \*       \*

Considering how often trial courts review and approve class action settlements, especially in the wage and hour context, there are few published California cases providing guidance on this process. Parties seeking approval must generally rely on federal authority. Due to this paucity in state law, we publish this opinion to provide guidelines for courts in evaluating class action settlements.

Plaintiff Irean Amaro filed this wage and hour class action and Private Attorneys General Act (PAGA) lawsuit against defendant Anaheim Arena Management (AAM) in 2017. At the time, there were already two existing class actions asserting the same claims. One had been filed in 2014 and the other in 2016. About a month after filing her lawsuit, Amaro and AAM reached a global settlement that covered the claims asserted in the two prior class actions. The plaintiffs from the prior actions, which included intervener Rhiannon Aller, were not involved in those settlement discussions. Aller intervened in this lawsuit and objected to the settlement. Initially, the trial court denied preliminary approval of the settlement on grounds Amaro had not given the court enough information to determine the adequacy of the settlement. Amaro then engaged in extensive informal discovery and entered into an amended settlement with AAM. The court approved the amended settlement over Aller's objections and entered judgment per the settlement's terms.

Aller appeals, claiming the court's approval of the settlement was erroneous for two reasons. First, she argues the class members' release in the settlement is improper because it extends to claims outside the scope of Amaro's complaint, waives class members' (from all class actions) claims under the Fair Labor Standards Act (FLSA) without obtaining their written consent, and releases PAGA claims beyond the limitations period of Amaro's own PAGA claim. We agree the release is overbroad. It covers "potential claims . . . in any way relating to the" facts pled in the complaint. The "in any way relating" language causes the release to unreasonably extend to claims that may only be tangentially related to the allegations in Amaro's complaint, rendering it

2

overbroad. However, we reject Aller's other contentions. The FLSA's written consent requirement does not apply to a release in a class settlement of state wage and hour claims. Further, nothing in the PAGA statute prevents Amaro from releasing claims outside the limitations period of her own claim.

Next, Aller contends the court abused its discretion in finding the settlement was not the product of a collusive reverse auction. Such an event occurs when a defendant sued in multiple class actions picks the most ineffectual class counsel to negotiate a weak settlement that precludes all the other class action claims. Aller primarily relies on the fact that AAM attempted to separately negotiate settlements with the plaintiffs in the two prior lawsuits. After those settlement discussions failed, AAM bypassed those plaintiffs and undercut their claims by negotiating a settlement with Amaro that extinguished the other class actions. We find there is nothing inherently wrong with this process. When such a settlement occurs, the objecting party must also show, at the very least, some evidence of unfairness to the class or misconduct to support a collusive reverse auction finding. Aller has not done so. Nor has she presented sufficient evidence to warrant discovery into whether the settlement was collusive.

Though we reject most of Aller's arguments, we reverse the judgment and remand with directions due to the overbreadth of the release.

I

FACTS AND PROCEDURAL HISTORY

A. *Prior Lawsuits Against AAM*

AAM operates the Honda Center, a large indoor arena in Anaheim that hosts sporting competitions, concerts, and other large events. In December 2014, interveners Manuel Navarro-Cabrera and Rhiannon Aller filed a PAGA and wage and hour class action against AAM in Orange County Superior Court (the *Navarro/Aller* action). Generally, the plaintiffs in the *Navarro/Aller* action alleged AAM was not

3

paying its nonexempt employees for all the hours they worked. Among other things, they alleged AAM (a) used a timekeeping rounding system that unlawfully shaved employee hours; (b) did not compensate employees for time spent walking or taking shuttles from Angel Stadium, where they were required to park, to the Honda Center; (c) did not pay employees for time spent waiting in line for security checks or to clock in; and (d) did not provide legally adequate meal and rest periods.

Based on these allegations, the plaintiffs in the *Navarro/Aller* action asserted claims based on multiple violations of the Labor Code,[1] including (a) failure to pay minimum wages (§§ 1194, 1194.2, 1197), (b) failure to pay wages (§§ 201, 202), (c) failure to pay overtime (§§ 510, 1194), (d) failure to provide accurate itemized wage statements (§ 226), (e) failure to provide meal periods (§§ 226.7, 512), (f) failure to permit rest breaks (§§ 226.7, 512), and (g) waiting time penalties (§ 203). They also asserted claims under PAGA (§ 2698 et seq.) and Business and Professions Code section 17200 et seq. based on these Labor Code violations.

After conducting some initial discovery, the plaintiffs in the *Navarro/Aller* action and AAM engaged in a mediation in November 2015. The mediation was unsuccessful, so the plaintiffs continued their discovery efforts, including deposing representatives from AAM and AAM's third party timekeeping vendor.

Meanwhile, in February 2016, intervener Denise Cassaro filed a substantially similar wage and hour class action against AAM in Orange County Superior Court (the *Cassaro* action). Cassaro and AAM mediated the claims in June 2016, without involving the plaintiffs in the *Navarro/Aller* action. During negotiations, however, AAM indicated to Cassaro that it wanted a settlement that would also cover the *Navarro/Aller* claims. After the parties failed to settle, Cassaro's counsel contacted counsel for the plaintiffs from the *Navarro/Aller* action. They agreed it was in the best

---

[1] All further statutory references are to the Labor Code unless otherwise specified.

4

interest of the class to consolidate the two cases and litigate them together. The court granted their motion to consolidate in February 2017.

*B. This Action*

Plaintiff Amaro filed this PAGA and wage and hour class action against AAM on April 28, 2017, which largely asserted the same Labor Code violations and claims as the *Navarro/Aller* and *Cassaro* actions. Like those actions, Amaro alleged AAM's timekeeping system improperly shaved employees' time and that employees were not compensated for time spent on shuttles or waiting in line for security checks or to clock in. Similarly, she alleged employees either missed or had their meal and rest breaks cut short. Unlike the other two actions, Amaro also alleged AAM violated section 2802 by failing to reimburse employees for certain job-related expenses.

Prior to filing this action, Amaro's counsel conducted a two-and-a-half-month investigation into her claims. They conducted multiple interviews with Amaro, who worked for AAM from 2008 to 2016. They also reviewed her personnel file and other associated records, such as her earnings statements and correspondence with management. They examined 1,880 pages of AAM's policies and procedures, including information on AAM's operational guidelines, timekeeping system, employee clock-ins, attendance, meal and rest periods, and overtime pay, among other topics. Amaro's counsel also obtained time and payroll records from AAM for 238 class members and had a statistician analyze them to estimate AAM's exposure for the meal and rest period claims.

After conducting the above investigation but prior to filing the complaint, Amaro and AAM mediated the dispute with the Honorable Nancy Wieben Stock (Ret.). The parties were unable to settle at the mediation. Amaro rejected AAM's proposed terms and then filed this lawsuit. Judge Stock continued to work with the parties over several weeks, and she eventually made a proposal accepted by both sides.

5

Notably, two other similar lawsuits were filed against AAM after Amaro filed this action. In May 2017, Claire Gomez filed a substantially similar wage and hour class action against AAM (the *Gomez* action). Then, in October 2017, Gregory Maryarski filed a PAGA action against AAM that appears to be based on the same Labor Code violations as the prior lawsuits (the *Maryarski* action).

### C. The Initial Settlement

In June 2017, AAM filed a case management statement in the *Navarro/Aller* action, which indicated this action had settled and that its release would cover the claims asserted in the *Navarro/Aller*, *Cassaro*, and *Gomez* actions (the *Maryarski* action had not yet been filed). Prior to being served with this document, the plaintiffs in the other actions were unaware of any settlement discussions between Amaro and AAM (collectively, the settling parties). The court stayed discovery in the other actions while the settling parties prepared a motion for preliminary approval of the settlement, which Amaro eventually filed in October 2017.[2]

The settlement covered all nonexempt employees that worked for AAM between December 1, 2010 until the date the court granted preliminary approval of the settlement. AAM agreed to pay a gross amount of $1,750,000, with $40,000 of this sum allocated to Amaro's PAGA claim. The settling parties agreed to deduct various expenses from the gross amount, which were subject to court approval: $583,333 in attorney fees, which was one-third of the gross amount, and up to $15,000 in costs to Amaro's counsel, $30,000 in penalties to the Labor and Workforce Development Agency

---

[2] California Rules of Court, rule 3.769 governs court approval of class action settlements. First, the court must preliminarily approve a settlement. If such approval is granted, class members are notified of the settlement and given the opportunity to object. The court then "conducts a final approval hearing to inquire into the fairness of the proposed settlement. [Citation.] If the court approves the settlement, a judgment is entered with provision for continued jurisdiction for the enforcement of the judgment." (*Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1118.)

6

(LWDA) as required by section 2699, subdivision (i), $10,000 as an enhancement to Amaro, and up to $50,000 in administrative costs to a nonparty settlement administrator. Court approval of these deductions would have left $1,061,667 to split among the estimated 5,133 class members (as of April 2017), resulting in average payments of about $207 per member.

In addition to the monetary component of the settlement, AAM agreed to make certain policy changes. It agreed to replace its timekeeping rounding system with one that paid employees based on their exact clock-in times. It also agreed to automatically add five minutes of paid time to each employee's shift to compensate them for any time spent waiting in lines for security checks or to clock in. Amaro's counsel estimated these policy changes would generate approximately $510,000 a year in extra wages to employees.

The plaintiffs in the *Navarro/Aller* and *Cassaro* actions (collectively, the interveners) filed a motion to intervene in this lawsuit, which was granted. Following extensive briefing by the settling parties and the interveners, the court denied Amaro's motion for preliminary approval in June 2018. It recognized the settling parties were "represented by experienced, competent class action counsel and they relied on the services of a retired senior judge [with] substantial experience in complex class actions." But it concluded Amaro had failed to provide the court with sufficient information to "'understand[] . . . the amount that is in controversy and the realistic range of outcomes of the litigation.'" (Quoting *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785, 801-802.)

Among other things, the court noted that Amaro's counsel had not conducted any formal discovery. Nor had they reviewed the transcripts from the depositions previously taken in the *Navarro/Aller* and *Cassaro* actions, which contained "testimony giv[ing] some credence to the notion that some of the claims involve systemic violations more likely to be certified than those involving individualized assessments."

7

Further, the sources of information Amaro's counsel reviewed would not have allowed them to evaluate all the allegations in Amaro's complaint, such as whether employees were required to falsely record meal and rest breaks, purchase supplies for which they were not reimbursed, and wait in line for security screenings or to clock in. Nor did the information reviewed by her counsel "take into account the claim that AAM had a policy of improper rounding as a result of the [timekeeping] system . . . ."

D. *The Amended Settlement*

After the court denied preliminary approval of the initial settlement, Amaro's counsel engaged in further informal discovery. They obtained time and payroll records for all 5,494 nonexempt employees who worked for AAM between December 5, 2010 to June 30, 2018, and had them analyzed by a statistician to determine potential exposure for meal and rest period violations. Counsel also conducted 20 to 30 minute interviews with 25 class members to learn more about the violations alleged in Amaro's complaint. They also interviewed three management-level AAM employees regarding the relevant policies and reviewed the deposition transcripts from the *Navarro/Aller* and *Cassaro* actions. Further, Amaro's counsel retained a private investigator to assist them in conducting an on-site inspection of the Honda Center during an event, which involved observing and timing employees taking shuttles to and from work and going through security and clock-in lines.

The settling parties then reconvened settlement negotiations with the assistance of Judge Stock. They eventually agreed to an amended version of the settlement in September 2018, and filed a new motion for preliminary approval.

Similar to the initial settlement, the amended settlement covered nonexempt AAM employees that worked from December 5, 2010 to the date the court granted preliminary approval of the settlement. AAM agreed to pay a gross amount of $2,212,500, a $462,500 or 26.4 percent increase from the initial settlement. The

8

proposed deductions for attorney fees and costs, administrative costs, and Amaro's enhancement remained the same. But the amended settlement allocated $240,000 to the PAGA claim, with 75 percent of this sum ($180,000) going to the LWDA and 25 percent ($60,000) going to the class per section 2699, subdivision (i). It also contained an escalator clause, which provided for an increase in the gross amount proportionate to any increase in the class size between the date of the settlement and the date of preliminary approval (there were an estimated 6,037 class members as of the settlement date). The policy changes to which AAM had previously agreed were included in the amended settlement and had already been implemented by AAM.

The court granted preliminary approval of the amended settlement in December 2018 over the interveners' opposition. It concluded "[t]he amount and terms of the settlement appear fair, reasonable and adequate, and the settlement [was] supported by substantial evidence that counsel for [Amaro] adequately assessed the value of the case and the risks, and came to a fair settlement. Although much of the information was obtained through informal processes, the information was sufficient to allow [Amaro] to assess and value potential recovery." Further, the court found "the settlement [was] not collusive." (Italics omitted.)

Notice of the settlement was then mailed to the 6,151 confirmed class members, and they were given 60 days to either opt out of or object to the settlement. In all, 39 people opted out of the settlement (0.6 percent of the class), and only Aller submitted a valid objection. Based on the number of participating class members, the settlement administrator determined the smallest class member payment would be $1.68 (for people that worked only one shift during the class period), the average payment would be $231.67, and the largest payment would be $3,662.12.

When Amaro moved for final approval of the settlement in March 2019, the gross amount of the settlement had increased by $41,780 to $2,254,280, which appears to be the result of the escalator clause. The court granted final approval over Aller's

9

objection and issued a detailed minute order addressing the arguments. In connection with the motion, the court granted Amaro's counsel $583,333 in fees and $10,266.87 in costs. Amaro was awarded a $5,000 enhancement, and the settlement administrator was allowed $43,500 in costs.

The court subsequently entered judgment in accordance with the settlement.[3] Intervener Aller appeals on grounds the court erred in approving the settlement. First, she argues the scope of the release was impermissibly overbroad. Next, she asserts the settlement was the product of a collusive reverse auction. Finally, she contends the court erred by denying her request to take discovery as to whether the settlement was collusive. As explained below, we agree the release was overbroad but are not persuaded by the other arguments.

II

DISCUSSION

A. Legal Standard

"'"[T]o prevent fraud, collusion or unfairness to the class, the settlement or dismissal of a class action requires court approval."'" . . . The purpose of the requirement is 'the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties.'" (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1800-1801.) "'Due regard' . . . 'should [also] be given to what is otherwise a private consensual agreement between the parties. The [court's] inquiry "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion

---

[3] Throughout the remainder of this opinion, we use the term "settlement" to refer to the amended settlement approved by the court, and we use the term "initial settlement" and "amended settlement" when necessary to distinguish between the two.

10

between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." [Citation.] "Ultimately, the [trial] court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'"" (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1145.)

The appellate court "'make[s] no independent determination whether the settlement terms are "fair, adequate and reasonable," but only determine[s] whether the trial court acted within its discretion.'" (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 581.) "Great weight is accorded the trial judge's views. The trial judge '"is exposed to the litigants, and their strategies, positions and proofs. [She] is aware of the expense and possible legal bars to success. Simply stated, [she] is on the firing line and can evaluate the action accordingly."' [Citations.] To merit reversal, both an abuse of discretion by the trial court must be 'clear' and the demonstration of it on appeal 'strong.'" (*7-Eleven Owners for Fair Franchising v. Southland Corp.*, *supra*, 85 Cal.App.4th at pp. 1145-1146.)

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)

## B. *Scope of the Release*

Aller asserts the class members' release in the settlement is improper for several reasons. We review her arguments in turn.

11

*1. Overbreadth*

Aller claims the release is unlawfully overbroad because it extends to claims that are entirely unrelated to the wage and hour allegations in Amaro's complaint. While the release is not as broad as Aller suggests, we agree it impermissibly extends to claims outside the scope of the complaint.

The parties' dispute over the scope of the release is unsurprising. The release clause is an unwieldy monstrosity of a 375-word sentence that we only partially include here. It covers "all claims asserted in Amaro's operative Complaint, and any amended Complaints, *and potential claims reasonably arising out of or in any way relating to the same set of operative facts and/or theories pled therein*, including the alleged failure of AAM to provide Plaintiff with compensation as required by federal and/or state law, and including but not limited to Class Members' Claims and potential claims concerning wages, expense reimbursements, deductions, record keeping, off the clock work, ~~commissions,~~ incentive pay, ~~bonuses, reporting time pay,~~ minimum wages, overtime, meal periods and premiums, rest periods and premiums, ~~split shift premiums,~~ itemized wage statement penalties and damages under California and/or federal law, including the [FLSA], the failure to pay penalties and premiums under the California Labor Code, including without limitation Labor Code §§ 201-203, 204, 206, 206.5, 210, 218, 218.6, 223, 224, 225.5, 226, 226.3, 226.7, 227, 227.3, 510, 512, 551, 552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1197, 1197.1, 1198, 2698, et seq., 2753, 2800, 2802, 2810.5, Bus. and Prof. Code sections 17200, et seq., the [FLSA] . . . , and [PAGA], the Wage Orders, and any other claims whatsoever alleged in this action, including without limitation all claims predicated on time rounding, time-shaving, grace periods, off the clock work (including but not limited to, time spent subject to AAM's control, time spent waiting for and traveling in shuttles, time spent walking from shuttle drop-off to security, time spent passing through security, time spent walking from security to time clocks, time spent waiting in line to clock in, time spent walking from time clocks to building

12

exits and shuttle pick-up areas), maintaining and/or purchasing uniforms, tools, and equipment, requests for personnel or payroll records, calculation of the regular rate for overtime purposes, meal and rest periods, ~~split shift premiums, reporting time pay,~~ itemized wage statements, deductions, payment of overtime, straight time, minimum wages, vacation, ~~bonuses/commissions,~~ transportation in shuttles, for restitution and other equitable relief, liquidated damages, waiting time penalties, other compensation, ~~commissions,~~ or benefits, <u>arising from their employment with AAM, or separation from employment,</u> <u>whether known or unknown</u>, during the Class Period . . . ." (Italics & underlining added, strikethrough in original.)

The struck terms were initially included in the release. They were removed by the settling parties after the court commented during final approval that "split shifts, bonuses, commissions and reporting time claims . . . are not at issue in this case. The release is not limited to those claims specifically made and investigated in connection with this suit and must be revised."

The parties' primary dispute is whether the italicized language in the above release clause modifies the remainder of the sentence. The settling parties say that it does, while Aller contends it does not based on the sentence's punctuation. In particular, Aller believes the underlined terms above are not modified by the italicized language, which allows the release to engulf employment claims entirely unrelated to this action, such as claims for discrimination or wrongful termination. The settling parties provide the better interpretation.

"'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible.'" (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1022.) Based on its structure, the settling parties intended to limit the reach of the release to "potential claims reasonably arising out of or in any way relating to the same set of operative facts and/or

13

theories pled" in Amaro's complaint. The placement of the word "including" after this phrase signals the remainder of the sentence provides a noninclusive list of examples of released claims. Supporting this interpretation is the fact that claims completely unrelated to the allegations in Amaro's complaint were struck from the sentence, such as claims relating to split shifts, bonuses, and commissions.[4] Further, while not dispositive, it is notable that the settling parties insist they intended the italicized language to modify the remainder of the sentence.

Next, Aller maintains that even if the settling parties are correct on the above point, the release is still overbroad because it covers claims "in any way relating to the same set of operative facts and/or theories pled" in the complaint. She argues the phrase "in any way relating" unreasonably extends the release to claims beyond the scope of the allegations in Amaro's complaint. We agree.

In a class action settlement, "'[a] clause providing for the release of claims . . . may refer to all claims, both potential and actual, that *may have been raised* in the pending action with respect to the matter in controversy.'" (*Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 586 (*Villacres*).) "'[A] court may release not only those claims alleged in the complaint and before the court, but also claims which "could have been alleged by reason of or in connection with any matter or fact set forth or referred to in" the complaint.'" (*Ibid*., italics omitted.) While these statements do not expressly address the limits of a class release, they contain an implicit boundary: a court cannot release claims that are outside the scope of the allegations of the complaint. This reading of *Villacres* is bolstered by the fact that it relied heavily on federal law. Nearly all federal circuits have found that "[a] settlement agreement may preclude a party from bringing a related claim in the future . . . only where the released claim is 'based on *the identical factual predicate* as that underlying the claims in the settled class action.'"

---

[4] The release includes claims relating to "vacation," which was not at issue in Amaro's complaint. The inclusion of this term appears to be an oversight by the settling parties.

14

(See, e.g., *Hesse v. Sprint Corp.* (9th Cir. 2010) 598 F.3d 581, 590-591, italics added; 6 Newberg on Class Actions (5th ed. 2021) § 18:19.) "'Put another way, a release of claims that "go beyond the scope of the allegations in the operative complaint" is impermissible.'" (*Marshall v. Northrop Grumman Corp.* (C.D. Cal. 2020) 469 F.Supp.3d 942, 948-949.)

Here, the release extends past this boundary. The allegations in Amaro's complaint pertain to AAM's timekeeping system, unpaid time spent waiting in line, missed meal and rest periods, and reimbursement for work-related expenses. By extending to claims that "in any way relat[e]" to these allegations, the release ensnares claims outside the scope of Amaro's complaint. To illustrate, suppose a class member filed a lawsuit alleging AAM retaliated against her for reporting to a government agency that AAM was breaking the Labor Code by failing to provide employees meal and rest breaks during the release period. (See § 1102.5, subd. (b); see, e.g., *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1148-1150.) This retaliation claim is not based on the same factual predicate as Amaro's complaint. The crux of the claim – retaliation – is completely absent from the pleading. Nor can it be inferred from the complaint's allegations. But since this retaliation claim tangentially relates in *some* way to Amaro's meal and rest period allegations, it appears to have been released by the settlement.

A class action settlement must be approved by the court to protect "'"class members . . . whose rights may not have been given due regard by the negotiating parties."'" (*Luckey v. Superior Court* (2014) 228 Cal.App.4th 81, 93.) Consequently, courts must remain vigilant and ensure that class releases do not extend to claims that are beyond the scope of the allegations in the complaint. Releases must be appropriately tethered to the complaint's factual allegations. For example, the portion of the release covering "potential claims reasonably arising out of . . . the same set of operative facts" pled in the complaint is sufficiently tailored. The retaliation claim identified above does

15

not "reasonably aris[e]" from the facts pled in the complaint. Similarly, the release would have been acceptable had it been limited to claims "reasonably related" to the allegations in the complaint rather than "in any way relat[ed]." Requiring a reasonable connection prevents the release from extending to claims that are only remotely related to the allegations in the complaint.

To be clear, we do not mean to suggest the above examples provide the only acceptable phrasing of class releases. Rather, these examples are only meant to provide some guidance to the trial courts that review class action settlements. There are certainly other formulations that properly limit the scope of the class release to the allegations in the complaint. We only mean to encourage courts to scrutinize class releases to ensure they are reasonably tethered to the complaint's allegations.

Finally, the release is overbroad for another reason. As drafted, it releases "potential claims . . . relating in any way to the . . . theories pled" in the complaint. As discussed above, the release must be tied to the *factual allegations* in the complaint, not the claims or theories of liability asserted. (See *Villacres*, *supra*, 189 Cal.App.4th at p. 586; *Hesse v. Sprint Corp.*, *supra*, 598 F.3d at pp. 590-591.) Class members could potentially have claims that arise from the same legal theories as Amaro's complaint but are not based on the same allegations.

Due to the unreasonable overbreadth of the release, the court should not have granted final approval of the settlement. This error, however, does not warrant throwing out the entire settlement and demanding the settling parties start the approval process from scratch. We also recognize that neither "the [trial] court nor this court is empowered to rewrite [a] settlement agreed upon by the parties. [Courts] may not delete, modify, or substitute certain provisions of the [settlement]." (*Officers for Justice v. Civil Service Com.* (9th Cir.1982) 688 F.2d 615, 630.) Thus, on remand, we direct the court to hold final approval proceedings to determine whether the settling parties can amend the release so it conforms with this opinion.

16

### 2. *Release of FLSA claims*

Aller also argues the settlement's procedure for releasing FLSA claims (29 U.S.C § 201 et seq.) is unlawful. As background, the FLSA establishes standards for minimum wages and overtime pay, and it allows employees to bring collective actions against their employers for violating those standards. (*Haro v. City of Rosemead* (2009) 174 Cal.App.4th 1067, 1070-1071.) There is an inherent tension between FLSA collective actions and class actions. Class actions under California and federal law generally require class members to opt out to avoid being bound by the terms of a judgment. In contrast, an employee must opt in to become a plaintiff in an FLSA collective action. (*Id*. at pp. 1070-1072, 1076.) "No employee shall be a party plaintiff to [an FLSA] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." (29 U.S.C. § 216, subd. (b).) Due to this tension, California courts have found FLSA actions cannot be maintained as class actions under state law. (*Haro v. City of Rosemead*, *supra*, 174 Cal.App.4th at p. 1070.)

Though Amaro did not assert an FLSA claim, the settlement attempts to comply with the statute's opt-in requirement to effectuate a release of class members' FLSA claims. The class notice explains that class members who cash their settlement checks "will be deemed to have opted into the action for purposes of the FLSA and [will] thereby release and waive any of their claims under the FLSA." In contrast, class members that participate in the settlement but do not cash their checks will retain their FLSA claims. Aller insists this check cashing opt-in procedure does not comply with the FLSA, which requires filed written consent. (See 29 U.S.C. § 216, subd. (b).) In response, the settling parties argue the FLSA's opt-in requirement does not apply to the settlement under *Rangel v. PLS Check Cashers of Cal., Inc.* (9th Cir. 2018) 899 F.3d 1106 (*Rangel*). We agree with the settling parties but for reasons other than *Rangel*.

17

To our knowledge, no state appellate court has addressed this issue in a published decision. Both sides extensively discussed *Rangel* in their briefs, which we find inapposite. In *Rangel*, the Ninth Circuit found the plaintiff's FLSA claim was precluded by a prior class action settlement of state law claims that released "all claims arising from the allegations on which [the plaintiff's] FLSA action [was] predicated." (*Rangel*, *supra*, 899 F.3d at p. 1108.) The plaintiff's FLSA claim was based on the same primary right as the state law claims, and the court determined the opt-in requirement was irrelevant to the primary rights analysis. (*Id*. at pp. 1110-1111.) Significantly, though, the Ninth Circuit expressly declined to address the issue we face here: whether a plaintiff can circumvent the FLSA's opt-in requirement by "first bringing state law labor claims in an opt-out class action, then reaching a settlement that extends to the FLSA." (*Id*. at pp. 1111-1112.) Instead, the proper time to raise this argument was during the settlement approval process (*ibid*.), which Aller did here. The plaintiff in *Rangel* did not. (*Ibid*.)

Though the settling parties' reliance on *Rangel* is misplaced, we are persuaded the FLSA's opt-in requirement does not apply for other reasons. First, nothing in the text of the FLSA requires that the opt-in requirement be applied here. The statute provides that "[n]o employee shall be a *party plaintiff* to [an FLSA] action unless he gives his consent in writing to become such a party . . . ." (29 U.S.C. § 216, subd. (b), italics added.) This is not an FLSA action. Amaro did not assert an FLSA claim for other employees to join. And nothing in the statute suggests it applies to a class settlement of state law claims that also releases potential FLSA claims based on the same allegations. "'[E]ven when the court does not have power to adjudicate a claim, it may still "approve release of that claim as a condition of settlement of [an] action [before it]."'" (*Villacres*, *supra*, 189 Cal.App.4th at p. 586; *Cotter v. Lyft, Inc.* (N.D. Cal., Mar. 16, 2017, No. 13-cv-04065-VC) 2017 WL 1033527, at p. *1 [the FLSA's opt-in requirement "speaks only to the circumstances in which a plaintiff will be allowed to

18

*participate* in an FLSA action, not to circumstances in which a plaintiff who is not participating in an FLSA action will be allowed to release potential FLSA claims"].)

Second, nothing in the purpose behind the FLSA's opt-in requirement hints it has any application here. There was no opt-in requirement when Congress passed the FLSA in 1938. It was added in a 1947 amendment. (*Hoffmann-La Roche Inc. v. Sperling* (1989) 493 U.S. 165, 173.) "The legislative history clearly indicates that the purpose of the amendment was *to protect employers* from facing 'financial ruin' and prevent employees from receiving 'windfall payments, including liquidated damages.'" (*Harris v. Investor's Business Daily, Inc.* (2006) 138 Cal.App.4th 28, 33-34, italics added; *Hoffmann-La Roche Inc.*, at p. 173 ["The relevant amendment was for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers of the burden of representative actions"].)

These concerns are not implicated here. Rather, allowing employers to settle FLSA claims within the context of a state law wage and hour class action furthers the purpose of the opt-in requirement by preventing defendants from facing repetitious litigation for the same underlying conduct. (See *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 741 ["Class actions offer a means of avoiding 'repetitious litigation' [citation] and 'a multiplicity of legal actions dealing with identical basic issues'"]; *Hoffmann-La Roche Inc. v. Sperling*, *supra*, 493 U.S. at p. 173.) Moreover, there is no concern of class members receiving windfall payments by failing to opt in.

### 3. *Release of PAGA claims*

PAGA allows an "'aggrieved employee'" to bring a representative civil action against their employer on behalf of other current or former employees to recover civil penalties for Labor Code violations. (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980-981.) Aller makes a series of arguments that distill to a single issue: whether Amaro can release class members' PAGA claims beyond the one-year limitations period

19

of her own PAGA claim. (See *Brown v. Ralphs Grocery Co.* (2018) 28 Cal.App.5th 824, 839 (*Brown*) [establishing one-year limitations period for PAGA claims].) The settlement releases class members' PAGA claims dating back to December 5, 2010. However, since Amaro submitted her PAGA notice to the LWDA on February 21, 2017, Aller maintains Amaro can only release class members' PAGA claims arising on or after February 21, 2016. We disagree. Nothing in the statute prohibits Amaro from releasing PAGA claims outside the limitations period of her own claim. Nor is this practice contrary to PAGA's purposes.[5]

"In civil cases, the statute of limitations is not jurisdictional but merely serves a procedural function and constitutes an affirmative defense that is waived unless pleaded and proved." (*People v. Williams* (1999) 77 Cal.App.4th 436, 457-458; *Brown*, *supra*, 28 Cal.App.5th at pp. 842-843 ["A defendant waives a statute of limitations defense by failing to plead it in an answer or raise it as a ground of a general demurrer"].) If the Legislature had intended to make the limitations period for PAGA jurisdictional rather than an affirmative defense, it would have said so. (See *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 85.) Since it did not, we must presume the general rule applies. As such, it was within AAM's discretion to waive its statute of limitations defense so Amaro could release class members' PAGA claims dating back to December 2010. And even if PAGA's statute of limitations were jurisdictional, that would not bar the court from approving a release of claims outside the limitations period. (*Villacres*, *supra*, 189 Cal.App.4th at p. 586.)

_____

[5] Unlike a class action, "there is no mechanism for opting out of [a] judgment entered on [a] PAGA claim." (*Robinson v. Southern Counties Oil Co.* (2020) 53 Cal.App.5th 476, 482.) As such, it seems a single settlement of PAGA and class claims should consist of two separate payments and releases. One for the PAGA claims, from which aggrieved employees cannot opt out, and the other for the class claims, from which class members can opt out. Since Aller does not raise this issue, though, we will not decide it.

Further, nothing in the purpose of the statute convinces us that plaintiffs should be barred from agreeing to such a release of PAGA claims. PAGA "'"is fundamentally a law enforcement action,"'" not one for the benefit of private parties." (*ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 196-197.) "The Legislature's sole purpose in enacting PAGA was 'to augment the limited enforcement capability of the [LWDA] by empowering employees to enforce the Labor Code as representatives of the [LWDA].' [Citations.] Accordingly, a PAGA claim is an enforcement action between the LWDA and the employer, with the PAGA plaintiff acting on behalf of the government." (*Kim v. Reins International California, Inc.*, *supra*, 9 Cal.5th at p. 86.) The "civil penalties recovered on the state's behalf are intended to 'remediate present violations and deter future ones,' *not* to redress employees' injuries." (*Ibid*.)

Before filing a PAGA claim, a plaintiff "must provide notice to the employer and the responsible state agency 'of the specific provisions of [the Labor Code] alleged to have been violated, including the facts and theories to support the alleged violation.' [Citations.] If the agency elects not to investigate, or investigates without issuing a citation, the employee may then bring a PAGA action." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545.) "The evident purpose of the notice requirement is to afford the relevant state agency, the [LWDA], the opportunity to decide whether to allocate scarce resources to an investigation, a decision better made with knowledge of the allegations an aggrieved employee is making and any basis for those allegations. Notice to the employer serves the purpose of allowing the employer to submit a response to the agency [citation], again thereby promoting an informed agency decision as to whether to allocate resources toward an investigation." (*Id*. at pp. 545-546.)

PAGA's one-year limitations period is intended to facilitate these processes. "[T]he Legislature[] desire[d] . . . quick action on workplace violations." (*Brown*, *supra*, 28 Cal.App.5th at p. 840.) "If a plaintiff could wait many years to assert violations of the Labor Code or amend deficient notices, the LWDA would be hard

21

pressed to make an informed decision about allocating scarce resources to old violations, the employer would be faced with responding based on stale evidence, and workplace violations could continue for years without being remediated or deterred." (*Id*. at pp. 840-841.)

Allowing Amaro to release PAGA claims outside the limitations period of her own PAGA claim does not interfere with these statutory goals. Amaro acted as the LWDA's representative to enforce the Labor Code as to AAM. The Labor Code violations she identified were the same as those alleged in the *Navarro/Aller* action, albeit from a more recent time period. Her notice did not deprive or interfere with the LWDA's opportunity to investigate the violations asserted by Aller or AAM's opportunity to respond to them. Moreover, due to Amaro's enforcement action, AAM agreed to pay $240,000 in PAGA penalties to remediate the Labor Code violations alleged in this lawsuit and the other actions. Aller has not shown this amount is unfair. (See *Williams v. Superior Court*, *supra*, 3 Cal.5th at pp. 549-550.)

Aller suggests Amaro's PAGA notice established the temporal scope of her authority to act on behalf of the LWDA. In other words, PAGA plaintiffs are only authorized by the LWDA to pursue and/or settle PAGA claims that arise within the year prior to their PAGA notice. We are unpersuaded. As discussed, the PAGA statute of limitations is an affirmative defense meant to facilitate the LWDA's investigation and the employer's response. It is not jurisdictional. Aller's reliance on *Brown* in support of her argument is misplaced. In *Brown*, the court sustained a demurrer on grounds the plaintiff's PAGA notice failed to adequately describe the *factual* allegations underlying her PAGA claims. (*Brown*, *supra*, 28 Cal.App.5th at pp. 829, 832.) "The notice did not give sufficient information for the LWDA to assess the seriousness of the alleged violations and decide whether to allocate scarce resources to an investigation, or for defendants to determine what policies or practices were being complained of, have an opportunity to cure the violations, and prepare a meaningful response." (*Id*. at pp. 837-

22

838.)  Nothing in this portion of *Brown* suggests Amaro can only release PAGA claims within the limitations period of her own claim.

Our opinion only finds that allowing a named plaintiff to release PAGA claims beyond the one-year limitations period of his or her own claim is not unlawful per se.  A trial court may still refuse to approve such a release if it is unfair given the circumstances of the case.  (See § 2699, subd. (*l*)(2); *Williams v. Superior Court*, *supra*, 3 Cal.5th at p. 549.)  No such circumstances exist here.

## C.  *Collusive Reverse Auction*

Next, Aller contends the court erred in finding the settlement was not the product of a collusive reverse auction.  However, that finding is supported by substantial evidence.

"'"When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*.'"  (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.)

"Courts have long recognized that 'settlement class actions present unique due process concerns for absent class members.'  [Citation.]  One inherent risk is that class counsel may collude with the defendants, 'tacitly reducing the overall settlement in return for a higher attorney's fee.'"  (*In re Bluetooth Headset Products Liability Litigation* (9th Cir. 2011) 654 F.3d 935, 946.)  "A reverse auction is said to occur when 'the defendant in a series of class actions picks the most ineffectual class lawyers to

negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.' [Citation.] It has an odor of mendacity about it." (*Negrete v. Allianz Life Ins. Co. of North America* (9th Cir. 2008) 523 F.3d 1091, 1099.) "To guard against this potential for class action abuse," class action settlements require court approval, "which may be granted only after a fairness hearing and a determination that the settlement taken as a whole is fair, reasonable, and adequate." (*In re Bluetooth Headset Products Liability Litigation*, *supra*, 654 F.3d at p. 946.)

There is sufficient evidence to support the court's finding the settlement was not the product of a collusive reverse auction. Amaro's counsel engaged in a two-and-a-half-month investigation before the initial mediation between Amaro and AAM, including a review of AAM's policies and procedures and an expert analysis of 238 class member's time and payroll data. Further, the parties did not settle at the mediation. The settlement was the product of several weeks of negotiation guided by a neutral mediator. Then, after the court refused to approve the initial settlement, Amaro's counsel engaged in additional informal discovery. They analyzed time and payroll records for nearly 5,500 employees, interviewed 25 class members and three management-level employees, reviewed deposition transcripts from the earlier actions, and conducted an on-site inspection of an event at the Honda Center to view working conditions. With the help of the same mediator, the parties then negotiated an amended settlement, which the court approved. Few class members opted out of the settlement and only Aller submitted an objection. From these facts, it can be reasonably inferred that the settlement was the product of good faith negotiation and was not a weak settlement agreed to by ineffectual counsel.

Moreover, Amaro's counsel did not seek an abnormally high fee. "'[F]ee awards in class actions average around one-third of the recovery'" regardless of "'whether the percentage method or the lodestar method is used.'" (*Chavez v. Netflix,*

24

*Inc.* (2008) 162 Cal.App.4th 43, 66, fn. 11.)  Here, the settlement allocated $583,333 in fees to Amaro's counsel (which the court approved), representing only 25.9 percent of the gross settlement fund.  The request was also in line with counsel's claimed lodestar of $533,384.  While Aller argues that much of that lodestar relates to counsel's effort to obtain approval of the settlement, it was reasonable for Amaro's counsel to include such fees in their lodestar calculation.  Obtaining court approval is an essential part of the class action settlement process.  Regardless, a court is not required to reduce a percentage recovery just because it is substantially higher than the lodestar.  (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 505.)

Aller's reply brief modifies her argument, claiming a reverse auction can occur even without evidence of collusion.  She believes a reverse auction occurred here because AAM sought to negotiate a global settlement separately with each of the named plaintiff(s) of the three class actions rather than negotiating with them collectively.  When negotiations with the plaintiffs in the *Navarro/Aller* and *Cassaro* actions failed, AAM then reached a settlement with Amaro specifically designed to extinguish the claims of those plaintiffs without their knowledge.[6]  Aller contends AAM's act of "plaintiff shopping" led to a massively discounted settlement that should not have been approved.  But there is nothing inherently wrong with such a process.  (See *Rutter & Wilbanks Corp. v. Shell Oil Co.* (10th Cir. 2002) 314 F.3d 1180, 1189; *Gallucci v. Gonzales* (9th Cir. 2015) 603 Fed.Appx. 533, 535.)  In such a scenario, a defendant may choose to negotiate collectively with all the plaintiffs from the separate class actions to avoid objections to a future settlement (as occurred here).  But we are not aware of any authority requiring a defendant to do so.  Nor does such a rule seem prudent, as there will inevitably be plaintiffs with unreasonable assessments of the merits of their claims or unrealistic

---

[6]  The earliest limitations period for Amaro's claims began running on April 28, 2013, but the release in the settlement extends back to December 5, 2010, to presumably cover the claims in the *Navarro/Aller* and *Cassaro* actions.

25

damage valuations that would thwart reasonable settlement offers. In such a case, a defendant would be unable to reach a global settlement with a reasonable plaintiff without being accused of engaging in a reverse auction.

We are unconvinced by Aller's contention that permitting a defendant sued in multiple class actions to negotiate separately with each named plaintiff will lead to a "race to the bottom." This assertion overlooks that trial courts are the gatekeepers of class action settlements. They must review and approve such settlements to ensure they are fair, adequate, reasonable, and free of collusion. (*Clark v. American Residential Services LLC*, *supra*, 175 Cal.App.4th at pp. 798-799.) Class members may object if they believe these standards have not been met in a given settlement. And objectors may appeal if they believe the trial court erred in approving a settlement.

For these reasons, the manner in which AAM settled with Amaro to extinguish the claims in the *Navarro/Aller* and *Cassaro* actions is not sufficient by itself to establish a reverse auction. When such a settlement occurs, the objector must at least provide some evidence of unfairness to the class or misconduct to support a reverse auction finding. (See *Negrete v. Allianz Life Ins. Co. of North America*, *supra*, 523 F.3d at p. 1099 [collusive reverse auction results in a weak settlement]; see, e.g., *Gallucci v. Gonzales*, *supra*, 603 Fed.Appx. at p. 535 [rejecting reverse auction argument because there was no evidence of a bidding war between potential class counsel].) Aller has not met this burden.

Aller implies the settlement is unfair because the amount paid by AAM represents a massive discount from its potential liability. Yet this discount could have been warranted for a variety of reasons. The court found the amount of the settlement was fair, reasonable, and adequate, and Aller fails to show this finding was unsupported by substantial evidence. In her reply brief, Aller briefly mentions that in calculating AAM's potential liability, Amaro failed to consider interest or liquidated damages available under the Labor Code. But she fails to explain why either would have applied

26

here. Nor does she describe how this purported error impacted Amaro's damage calculations, much less how it rendered the settlement unfair, unreasonable, or inadequate.

Likewise, Aller suggests the settlement amount was too low because her class claims were highly certifiable. But she has not provided any reasoned argument as to why the claims were likely to be certified. Nor has she explained how the potential for certification would have impacted the valuation of the claims or how it renders the settlement unreasonable. "When an appellant raises an issue 'but fails to support it with reasoned argument and citations to authority, we treat the point as waived.'" (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.) Given Aller's limited showing, we will not question the court's finding that the settlement amount was fair, adequate, and reasonable.

Next, Aller contends the court's refusal to preliminarily approve the initial settlement shows the settling parties' negotiations were fundamentally flawed from the start and is evidence of a reverse auction. Even if we agreed the initial negotiations were flawed, Amaro remedied this issue after the court denied preliminary approval. The court rejected the initial settlement because Amaro had not "provide[d] the Court with the information necessary for 'an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation.'" Had the settling parties simply increased the settlement amount and returned to court for approval, Aller's argument might be persuasive. But after the court's denial, Amaro engaged in extensive informal discovery before entering into the current settlement. In approving the settlement, the court found Amaro's counsel "adequately assessed the value of the case and the risks, and came to a fair settlement. Although much of the information was obtained through informal processes, the information was sufficient to allow plaintiff to assess and value potential recovery." (Italics omitted.) Aller has not shown this finding is unsupported by substantial evidence.

27

*D. Discovery as to Collusion*

Aller requests that if we find insufficient evidence of collusion, we should remand this case and allow her to conduct discovery into the negotiations between the settling parties. She maintains the court improperly denied her request for such discovery. We find the court did not abuse its discretion. (See *Cho v. Seagate Technology Holdings, Inc.* (2009) 177 Cal.App.4th 734, 748-749.)

"'It is well established . . . that objectors are not entitled to discovery concerning settlement negotiations between the parties without evidence indicating that there was collusion between plaintiffs and defendants in the negotiating process.'" (*Cho v. Seagate Technology Holdings, Inc.*, *supra*, 177 Cal.App.4th at pp. 748-749.) "'The objecting parties should not be permitted to frustrate the mutual interest of the class members and the defendant to resolve the litigation promptly by conducting extended or unnecessary discovery.'" (*Ibid.*) "[D]iscovery of evidence pertaining to settlement negotiations is appropriate only in rare circumstances. Because 'settlement negotiations involve sensitive matters,' the courts have consistently applied the principle that '"discovery [of settlement negotiations] is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive."'" (*Hemphill v. San Diego Ass'n of Realtors, Inc.* (S.D. Cal. 2005) 225 F.R.D. 616, 620; see *Cassel v. Superior Court* (2011) 51 Cal.4th 113, 136 ["[T]he encouragement of mediation to resolve disputes requires broad protection for the confidentiality of communications exchanged in relation to that process, even where this protection may sometimes result in the unavailability of valuable civil evidence"].)

Here, the court acted within its discretion by denying the requested discovery. We have discussed Aller's evidence supporting her collusive reverse auction theory above. None of that evidence materially shows or hints of any collusion between the settling parties. Thus, it was reasonable for the court to deny the discovery.

28

## III

## DISPOSITION

Because of the overbreadth of the release, we reverse the judgment of the trial court. As discussed above, on remand the court is directed to hold proceedings to determine whether the settling parties can amend the release to conform with this opinion. The parties shall bear their own costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


ZELON, J.*


* Retired Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.